Well, now I'm going to call the next case, 5-16-0-3-3-3, In the Interest of T. J. H., a minor. Counsel for the appellant, you may proceed. Please state your name for the record. Thank you, Your Honor. Good morning, Your Honors. And may it please the court, the counsel, my name is Tim McTuska, and I am the attorney for the respondent in this matter. My client is the father of the minor. The honors of this appeal comes pursuant to Supreme Court Rule 307-A-6, following both a fitness and a best interest hearing in the Circuit Court of Marion County. My client respectfully requests that this court find the trial court's June 8, 2016 order, which found that he failed to make reasonable efforts to correct the conditions that were the basis for removal of the minor child to be against the manifest weight of the evidence. My client also respectfully requests this court to find that the August 3, 2016 order from the trial court, which found that it was in the best interest of the minor child to terminate my client's parental rights, also to be against the manifest weight of the evidence. Procedurally and factually, a short background, the minor was born in November of 2014, that same month shortly after birth. It was a petition for a warranty that was filed. First Family Service Plan, which informed my client of his obligations, was put forward in January of 2015. Also, during January of 2015, and this is quite important, my client was arrested and was incarcerated from January 15 up through early to mid-December of 2015. In March, March 25, 2015, the minor was adjudicated to be abused and abducted, that date is important because that's going to be March 25, 2015, and that date is important because that begins the nine-month window that we're going to look at in order to discuss the children. There was a motion then for termination of parental rights that was filed in 2016, so a year after the minor was awarded the warrant, the motion for termination was filed. The respondent, my client, was found unfit for failure to make reasonable efforts to correct the conditions in June, on June 8, 2016, and then his parental rights were terminated on August 3, 2016. Now, I mentioned the fact that my client was incarcerated, he was in three different locations during that time period. Initially, he was held in the Marion County Jail from middle of January until sometime in April, 2015. From there, once he was convicted, he went to the Graham Correctional Center in Hillsborough, specifically where he was held in the X-House at Graham, and that specification is important as well. He remained at Graham and the X-House until sometime in August of 2015, before he was then transferred to Jacksonville for approximately two days, and then finally to a work release camp in Pittsfield, where he served the remainder of his sentence before being paroled in December. So, the nine-month period that we're looking at begins March the 25th, 2015. It then ends on December the 25th of 2015. The first issue that we presented, and the first order that we say was against the manifest way of the evidence, was that order dated June the 8th of 2016, which found that my client failed to make reasonable efforts to correct the conditions. That finding is based upon a subjective standard. It's different for each parent, for each person, presumably because the courts and the legislature knew that everyone is in a different position, subject to different limitations. So when we look, when the court looks at whether or not my client made reasonable efforts to correct these conditions, what's reasonable for individual A might not be reasonable for my client. The trial court, I think, overlooked part of that subjective standard. I mentioned the location that my client was incarcerated. There was testimony offered throughout the trial court proceedings as to what services may have been available to my client. Services that were called for by the family services. And there was virtually no testimony, no evidence presented as to what, if any, services were available while my client was at the Marion County Jail. My client didn't testify to it, and I don't believe anyone from the state testified as to those services either. So we have initially a three to four month period where we don't know if anything was available. I would suggest that the record shows then that nothing was available. From that point, my client goes to Grant Correctional Center. There was testimony offered by one of the case workers that there were certain classes, certain services available to my client while he was at Graham. What was not touched upon, though, and what I think the trial court overlooked, is that those services that were supposedly available at Graham  they were not, the testimony was not specifically that those services were available to inmates housed in the X house at Graham. My client testified that services were not available to individuals housed in the X house, that they were more or less restricted on their movements and on the offerings that they could take advantage of. So while the record does show testimony of services available to Graham Correctional Center inmates, it does not talk about, it does not show what was available to inmates in the X house at Graham Correctional Center. So just as we have no evidence of what was available to my client while he was at Marion County Jail, we also have no evidence of what's available to my client when he was housed in the X house. After about four months there, in August of 2015, I said he went then to Jacksonville for two days and ended up at a work release camp in Pittsburgh. Again, the evidence was via testimony from a social worker, a case worker, that the Jacksonville facility likely offered various services that my client was required to complete under the family service plan. What the record and what the testimony did not show, however, was whether or not those services were available to inmates at the specific Pittsfield work camp where my client was housed. So again, we've got a broad facility where these services are shown by the record to be available, but now we've got this more narrow location that falls under the Jacksonville umbrella, I suppose, and the record does not show that those services my client was required to complete were available to him. So the initial issue that we have and that we want to raise for the court is that these specific locations where my client was housed, the record doesn't show that he had services available to him. And that's important under the subjective standard, because while another inmate at Graham maybe could have taken these classes and completed these requirements, that doesn't mean that an inmate at X house at Graham would have access to those same programs, those same services. And the same argument applies to the Pittsfield work camp. While someone in the Jacksonville Correctional Center may have the ability to take certain classes and complete certain requirements. That doesn't necessarily mean that someone in the Pittsfield camp would have the access to those same programs and same classes. Under the subjective standard, I would request and encourage the court to keep those facts in mind. The state has the burden to show that my client failed to make reasonable efforts. And a lot is made in the trial court of, well, he didn't ask what was available. He didn't. The record doesn't indicate that he asked what was available. I think he admitted he did not ask. However, there was nothing shown by the state that even if he had asked, anything wasn't available. He testified, X house, the services weren't available. Pittsfield, the services were not available. That was not contradicted. There's nothing to show that he actually had those requirements available to him. There's a case law that talks about limitations in the subjective standard. There's a case that I cited in my brief. Initially, it is the first case of the NRA MA 325 LAP 3, 387. Which tells us that there's reasonable efforts as a subjective standard focusing on what is reasonable for that particular parent. That NRA MA case and that standard is talked about in the case of NRA GWEN P, 346 LAP 3, 584. Interestingly, both appellants and appellees cited that case in support of our positions. I believe that the NRA GWEN P case helps us because it talks about limitations on an incarcerated parent. We're not making the argument that this 91 window is total. Why would my client be incarcerated? Case law is clear that that's not the way. However, because he was incarcerated, he had limited access to classes, limited access to complete the things, the items that were required under his family service plan. GWEN P tells us that under the subjective standard, we need to consider the limited access that incarcerated parents have when we make a reasonable efforts determination. If their services are not available, it's not a failure to make reasonable efforts that those items were not completed. Basically, in my brief sense that's out there were at least 17 items that my client was to do prior to or during his incarceration. He completed the ones that he had the ability to complete. Some of them were just signing releases. Others were making sure that a social worker knew where he was, where he was living, how to get in touch with him. I have a question. I thought I read some place in the brief that he didn't even have a place to live. Did he have an address? He had an address. He had a house, but I don't think it was up to standards for housing a child. I think there were utility issues. I thought he stayed at somebody else's house. After his release, he was staying with a niece possibly, and then I think with friends after that. So he had a place, but it was not really suitable for living at the time. He was living with someone else. And then I think it was a little confusing when I first saw it that the child, this is not in this section, but I mean the child was living with her siblings. But they're not his kids. Apparently the four other children are not his. I think they're maternal. Yeah, maternal only. Yes, that's what I assumed. Yeah, I think that is true. Okay. So, again- At the timeline straight, he was not arrested until January, is that correct? January of 2015. But the child became a ward of the court, temporary ward in November, is that correct? That's correct, temporary in November. With the wardship finding actually then made it in March. So the shelter care was on what date? I don't know when the initial hearing was. The final adjudication was on March 25th, 2015. Wasn't it sometime in November 2014? It was, yeah. The child was born late November. Petition for the wardship was filed November 26th. So I would say sometime between then and the first two weeks of December. Has this child ever lived with a father? I don't believe so, Judge. I think the child was in the hospital with medical issues for approximately a month after birth, a month and a half. Foster parents then took the child directly back to their house. So the child has lived with foster parents for the entire time. How many other siblings are with foster parents? I think half siblings in the maternal side, there may be six to eight. It was a significant number, in addition to the foster parents have one or two natural children of their own. Back to being, to conclude the reasonable efforts argument, judges, my client did what he was able to do based upon the services that were available to him according to the record. Well, see, that's except the housing? Well, while he was incarcerated, I guess the housing doesn't really apply to him. But there were seven to ten other items as I was going through the list that for an individual who's incarcerated probably would not apply. Abstaining from drugs and alcohol, checking in with your probation officer. Those wouldn't necessarily be something that someone who's incarcerated is expected to do. Okay, counsel, we'll have an opportunity for rebuttal. Counsel for the appellee. May it please the court. Counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. Initially, I would note that this case was briefed by Attorney Ted Schwartz. Ms. Schwartz has accepted the clerkship with Justice Carmeier and is no longer with our office. As a result of that happening quite recently, I have not had the opportunity to read the record in this case. But I believe the facts as put forth in the respondent's brief and in the state's brief just appear to me to be quite straightforward. And I am relying on those briefs. But if there are things I don't know, please forgive me. I, too, would like to start out with sort of a review of the dates. Justice Moore, as you noted, in November of 2014, right after the child was born, a petition for courtship was filed. So, at this point in time, the defendant knew that he was at risk to lose his child. Nonetheless, two months later, he's arrested for battering the child's mother. Certainly not something that a parent that wants to keep his child would do. March 25th is the adjudication. March 25th is, therefore, when the nine-month period starts. It's when the service plan starts. In April of 2005, that's when the respondent was convicted. So, when we get to this, again, I- Can you tell me, did you say 5, 15? March 25th. April 11th. I'm sorry, April 2015. So, I agree that we need to look at the time frame when he was in the county jail, the time frame that he was in Graham, and the time frame when he was on work release. What I don't agree is that there's a three-month period that needs to be considered while he's in jail, because the adjudication of worship, the beginning of the nine-month period, the beginning of the service plan is in March, and he's convicted in April. So, as far as the time period that he was in the county jail and subject to the service plan, it's one month, not three or four months. I was glad to hear a counsel for a respondent say that there is nothing in the record as far as what services were available while he was in the county jail, because that was one thing I couldn't tell from the briefs, whether there was any testimony at all about what was available in that one month that he was in the county jail. So, March, or excuse me, April 25th, he is sent to Graham Penitentiary. May, the dispositional hearing. July. So, three months later, from the time he goes to Graham, until the time he goes, he is sent to Pittsfield, which is a work-release program, and is paroled in December, and the petition is terminated, filed in March of 2016, and then the hearing will be in May. So, our question, our biggest question, as far as on this hearing, is were the programs available, and what do we know about that? Now, the caseworker testified that programs were available at Graham. The respondent did not say no programs were available at Graham. He said, I couldn't do it. But here's the more important thing they said. He never asked anybody if these programs were available. So, how did he know he couldn't do it? We have a caseworker that says the programs are available. We have the defendant, I mean, the respondent saying he never even asked if these programs were available. Then, when we move on to the work-release program, again, he doesn't say that he can't. He said they didn't have it there. But he then admits that he never even inquired whether there were work-release, whether the work-release program offered these, the necessary things for, and I find this interesting because the very purpose, one of the stated purposes of work-release is to allow the defendants in criminal cases to obtain psychological treatment, including treatment for drug addiction and alcoholism. So, this is a very, very strained work-release program. If a respondent couldn't get treatment for drug addiction or alcoholism, or any of the other things, like, it's a little hard to tell from the language of the service plan, but from what I could tell from the briefs, I think there was a section that I would have said included parent classes. And I think that the trial court's conclusion that, and here I'm, I hope I'm quoting, asking whether a particular correctional facility offers any counseling service is an example of a reasonable effort. And I think that cannot be manifestly erroneous. And so far as Gwen P's case applies, I think it supports the state's position because Gwen P, the focus was on the amount of effort. The mother in Gwen P made efforts. She got on a waiting list for this program. She asked if she could do that program. The list in the case itself is quite extensive of the things she tried to do. Did she finish any of them? No. Did she even get on some of them? No. But she tried. The criterion is reasonable efforts. You need to have an effort. And in this case, the respondent made no efforts. And in fact, counsel for respondent says, well, there's nothing in the record to show what would happen if he started a program at Graham and then got transferred and couldn't finish it. Or what would happen if he started the men against violence, men challenging violence. What if he started that and didn't finish that? Well, again, the standard is reasonable efforts. If he started the program and got transferred, certainly he can say, I tried. I made an effort. And in this case, he never even asked if the programs were available. So I think when he actually supports the state's position that in order to have reasonable efforts, there has to be efforts. I'd like to move on briefly, if there are no other questions about the unfitness hearing. To the best interest, as this court noted, it appears that the child never lived with respondent and is currently living with her large group of siblings. I, again, I have not read the record, but I believe the briefs say eight siblings. As far as the respondent's position, in best interest, respondent testified he was living with a friend. He didn't have a home of his own. He did not have running water in his house. Obviously, he was arrested for domestic battery with the mother. He was kicked out of the men challenging violence classes for attending a class when he was under the influence of alcohol. He only had a temporary job. And because he only had a temporary job, he didn't have any health insurance. And this is critical because this was a premature child that even at this point in time needed special medical care, apparently had to go to St. Louis monthly for this therapy. In fact, respondent didn't even know about her therapy. As far as the child goes, the child has been with foster parents from Earth. They're the only parents the child's ever known. As I said, she's living with her, I'm sorry, I honestly just don't know if this child is a girl or a boy. But the child is living with siblings, obviously allowing connection with them and identifying with them and having family connections. Obviously, no attachment to the respondent. She's very happy with the foster parents. They want to adopt her. They've been taking her to all this special treatment that she needed. And she would have a permanent home and the only home she's ever known. So, if there are no other questions. Thank you. Thank you, counsel. Republicans? Thank you, Your Honor. The best interest argument, I'm sorry, the reasonable efforts argument. What I think we need to be clear here is the respondent should not have the burden of proving what services were not available to them. The burden of proving that he failed to take reasonable efforts is on the state. Part of that should mean that the state proves, shows some evidence or testimony that someone in these facilities has access to these services. These facilities, meaning these specific locations, respondent was housed. That simply is not in the record. I think the state is trying to push that burden onto the respondent, and I don't know, I don't think that that's appropriate. And I would ask the court to keep in mind that it's the state's burden of showing failure to make reasonable efforts. It's not the respondent's burden to show these did not exist. The state needs to show what did exist. To get to the best interest portion, keep in mind that my client, after his release in December, he did have a very short time within this initial nine-month window to get things accomplished. By the time the best interest hearing came around in August of 2016, he had made significant other progress towards employment. If you read the testimony, it actually does talk about he was a temporary employee but anticipated becoming full-time. If he became full-time, he would then be eligible for health insurance. So it's not that he's just someone sitting back doing nothing, letting his rights be terminated. Again, he is doing what he's able to do as he's able to do them, not at his own leisure or on his own schedule, but under the circumstances of someone who recently became paroled. The state talks about him being kicked out of the men challenging violence class because he was under the influence of alcohol. The record actually, he contradicts and denies that and says, no, I wasn't. I was more or less, she said I was under the influence, and I said, oh, yeah, I am. I had a sarcastic answer, probably not the best answer, but he does refute that and say, no, I was not actually under the influence. As far as the modern living arrangements, yes, she has been with the foster family and with quite a few of her siblings. For basically her entire life, once she got out of the hospital. What I think the court needs to, what I would request the court to keep in mind, however, is, given such a young child, of course they're only going to know the people that they've lived with for the first two years of their life. It's not reasonable to expect a two-year-old to know somebody that maybe she only sees once a week for an hour at McDonald's on a visit. I would ask that the court keep that in mind. Otherwise, I think there's a risk that even if a child were to be taken and placed in foster care at such a young age, if it was then turned out that the parent did nothing wrong, really the child never needed to or never should have been placed in foster care, well, because the only family she knows is the foster family, so we're going to terminate the parent's rights. I think there's a danger of going too far simply because of the desire for permanence and because of what the child knows. That alone, those two factors should not be given more weight than other factors. Did he ever establish that he had a permanent home, or did he just establish he was living with somebody and he didn't have any water or heat? I think he established that he was living with someone else in a suitable residence with utilities, but that his home, I don't know that he had children. Now, when you say his home, was that rental property or did he own it? He or his family owned it. It may have been something that was passed down through the family through inheritance. So you got a place with no heat and no electric? You could call it his, yes. Okay, so he's living with some friends or something. Yes. Okay. One more thing. Did he have any, if he did get custody of the child, if he did get the child, how was he going to take care of it? He was working part-time? No, I believe he was a full-time employee through a temp agency. Okay. Kind of on a probationary period. So once that probationary period ended, then he would become a full-time employee and no longer be through. He would become a permanent employee and not be through the temp agency. Okay, during that period of time, then who was going to, how many hours a week? What did he do? I don't know the record really says anything. Is that in there? I think it says he was full-time. Doing what? Factory work in Nashville, a little factory down there. Thank you, Your Honor. Thank you, counsel. The court will take the matter under advisement and issue it as position in due course. Ready to proceed.